# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **LING HU,** | |
| **Plaintiff,** | **No. 12 C 9267** |
| v. | **Magistrate Judge Mary M. Rowland** |
| **CAROLYN W. COLVIN, Acting Commissioner of Social Security,**[1] | |
| **Defendant.** | |

## MEMORANDUM OPINION AND ORDER

Pro se Plaintiff Ling Hu filed this action seeking reversal of the final decision of the Commissioner of Social Security (Commissioner) denying her application for Disability Insurance Benefits under Title II of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and Plaintiff has filed a motion for summary judgment. For the reasons stated below, the case is remanded for further proceedings consistent with this opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB), a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp.

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security and is substituted as the proper defendant in this action. 20 C.F.R. § 422.210(d) ("Where any civil action [against the Social Security Administration] is instituted, the person holding the Office of the Commissioner shall, in his official capacity, be the proper defendant.").

2d 973, 977 (N.D. Ill. 2001).[2] A person is disabled if he or she is unable to perform

"any substantial gainful activity by reason of any medically determinable physical

or mental impairment which can be expected to result in death or which has lasted

or can be expected to last for a continuous period of not less than 12 months." 20

C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability,

the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir.

2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to

a finding that the claimant is disabled. A negative answer at any point, other than

Step 3, ends the inquiry and leads to a determination that a claimant is not disa-

bled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of

proof is on the claimant through step four; only at step five does the burden shift to

the Commissioner." *Clifford*, 227 F.3d at 868.

---

[2] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The standard for determining DIB is virtually identical to that used for Supplemental Security Income (SSI). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on December 1, 2009, alleging that she became disabled on April 6, 2009, because of back disorders and osteoarthritis. (R. at 13, 54, 114). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 13, 54–66). On May 18, 2011, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 13, 28–53). The ALJ also heard testimony from Walter J. Miller, M.D., a medical expert (ME), and Edward F. Pagella, a vocational expert (VE). (*Id.* at 13, 28–53, 107, 108).

The ALJ denied Plaintiff's request for benefits on September 1, 2011. (R. at 13–21). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since April 6, 2009, the alleged onset date. (*Id.* at 15). At step two, the ALJ found that Plaintiff's left shoulder tendonitis, osteoporosis, hypothyroid disease, brachial plexopathy,[3] and cervical spine protrusions are severe impairments. (*Id.*). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id.* at 16).

---

[3] Brachial plexopathy "is a form of peripheral neuropathy. It occurs when there is damage to the brachial plexus, an area on each side of the neck where nerve roots from the spinal cord split into each arm's nerves." <www.nlm.nih.gov/medlineplus/ency/article/001418.htm>

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[4] and determined that she could perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except that "[Plaintiff] is precluded from climbing ladders, ropes, and scaffolds. She also is precluded from unprotected heights or hazards. [Plaintiff] can only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl." (R. at 16). Based on Plaintiff's RFC and the VE's testimony, the ALJ determined at step four that Plaintiff is capable of performing past relevant work as a CAD designer. (*Id.* at 20). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability as defined by the Act. (*Id.* at 21).

The Appeals Council denied Plaintiff's request for review on September 27, 2012. (R. at 1–3). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in gen-

---

[4] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

eral, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a "logical bridge" between that evidence and the ultimate determination." *Moon v. Colvin*, — F.3d —, No. 13-3636, 2014 WL 3956762, at *2 (7th Cir. Aug. 14, 2014). Instead, the Court must critically review the ALJ's decision to ensure that the ALJ

has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. MEDICAL EVIDENCE

On September 25, 2008, Plaintiff began treating with Marie Kirincic, M.D. (R. at 224–25; *see id.* at 496). Plaintiff complained of neck, shoulder, and upper back pain radiating down her left upper extremity, which she had experienced over the previous several months. (*Id.* at 224). An MRI performed the next day found slight left lateral disc protrusion at C5/6 and very minimal protrusion of the C4/5 disc. (*Id.* at 220).

On October 2, 2008, Plaintiff complained of ongoing neck, shoulder, and upper back pain radiating occasionally to her left upper extremity and intermittently to her shoulder blades. (R. at 226). Dr. Kirincic found that Plaintiff's pain was 10/10, with multiple fibromyalgia trigger points[5] and marked tenderness and tightness throughout the whole cervicothoracolumbar area. (*Id.*). She diagnosed possible left cervical radicular pain but mainly mild osteopenia and myofascial pain. (*Id.*). Dr.

---

[5] "Fibromyalgia is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues. Researchers believe that fibromyalgia amplifies painful sensations by affecting the way your brain processes pain signals. . . . In the past, doctors would check 18 specific points on a person's body to see how many of them were painful when pressed firmly. Newer guidelines don't require a tender point exam. Instead, a fibromyalgia diagnosis can be made if a person has had widespread pain for more than three months—with no underlying medical condition that could cause the pain." <http://www.mayoclinic.org/diseases-conditions/fibromyalgia/basics/definition/con-20019243> [hereinafter Mayo Clinic: Fibromyalgia]

Kirincic prescribed Flexeril and referred Plaintiff for massage therapy and acupuncture. (*Id.*). On October 16, 2008, Dr. Kirincic found Plaintiff had more than 11/18 fibromyalgia tender points and pain of 8/10. (*Id.* at 227). She prescribed Arthrotec and offered Ultracet,[6] but Plaintiff declined to take pain medication. (*Id.*). Plaintiff preferred to try physical therapy, which Dr. Kirincic cautioned would take a long time to see results. (*Id.*).

On October 21, 2008, Plaintiff complained of sharp, shooting pains in her lower extremity. (R. at 228). Plaintiff expressed hope that physical therapy will allow her to return to work full time. (*Id.*). Dr. Kirincic found 11/18 tender points, slight weakness, and pain of 6–8/10. (*Id.*). She diagnosed fibromyalgia, myofascial pain syndrome,[7] osteopenia,[8] and marked anxiety. (*Id.*). A November 4, 2008 MRI of the thoracic spine was normal. (*Id.* at 221).

Plaintiff underwent physical therapy from October to December 2008. (R. at 249–70). Her therapist frequently reminded Plaintiff to work with less intensity and to improve her breathing pattern. (*Id.* at 250). Plaintiff cancelled her last two

---

[6] Arthrotec is a nonsteroidal anti-inflammatory drug (NSAID) used to treat osteoarthritis. Ultracet is a narcotic-like medication containing a combination of tramadol and acetaminophen and is used to treat moderate to severe pain. <www.drugs.com>

[7] Myofascial pain syndrome is a chronic pain disorder, in which pressure on sensitive points in the muscles (trigger points) causes pain in seemingly unrelated parts of the body. . . . Treatment options for myofascial pain syndrome include physical therapy and trigger point injections. . . . Some research suggests that myofascial pain syndrome may develop into fibromyalgia in some people." <www.mayoclinic.org/diseases-conditions/myofascial-pain-syndrome> [hereinafter Mayo Clinic: Myofascial Pain Syndrome]

[8] "Osteopenia is a condition where bone mineral density is lower than normal. It is considered by many doctors to be a precursor to osteoporosis." <en.wikipedia.org/wiki/Osteopenia>

scheduled appointments complaining of being sick. (*Id.* at 249). On discharge, she continued to experience upper thoracic pain, although the intensity had decreased from the initial evaluation. (*Id.*). Her left shoulder and cervical mobility were within normal limits; however, she experienced occasional pain with left cervical side-bending and extension. (*Id.*). Plaintiff underwent additional physical therapy from December 2008 to April 2009. (*Id.* at 272–411).

On December 1, 2008, Plaintiff complained of multiple body pains, especially low back pain radiating down both lower extremities, extreme fatigue, and discomfort in both elbows and wrists. (R. at 230). On physical examination, Dr. Kirincic found Plaintiff positive for 18/18 fibromyalgia points. She opined that Plaintiff "suffers more from fibromyalgia and myofascial pain syndrome, osteopenia, anxiety, then [*sic*] acute radiculopathy." (*Id.*). Dr. Kirincic concluded that Plaintiff "would be best served by an interdisciplinary pain program, Fosamax,[9] and blood work was ordered." (*Id.* at 231). X-rays of the cervical and thoracic spine on December 9, 2008, were "unremarkable." (*Id.* at 237–38).

On December 9, 2008, Plaintiff began treating with a chiropractor and a physical therapist at Woodward Medical Center. (R. at 403–11; *see id.* at 272–337, 341–412). On December 17, 2008, she complained of muscle spasm and insidious pain that ranged from 3–7/10. (*Id.* at 307). Despite the therapy and medications, the pain remained consistently at 4–6/10 into February 2009. (*Id.* at 299–306; *see id.* at 365–

---

9 Fosamax (alendronate) is used in women to treat or prevent osteoporosis. <www.drugs.com/fosamax.html>

71). A February 18, 2009 progress report noted that Plaintiff's neck and back continue to consistently bother her with pain fluctuating from 3–7/10. (*Id.* at 298). Plaintiff was frustrated by her slow improvement. (*Id.*). Her physical therapist concluded that Plaintiff's progress was slowed by continued flare-ups of her pain, which is easily triggered by her exercises. (*Id.*). Plaintiff still presented with limited range of motion, especially in the cervical region. (*Id.*).

Despite her triweekly physical therapy sessions, Plaintiff exhibited little improvement during February and March 2009. (R. at 292–97). She consistently complained of pain, tightness, and muscle spasm that were aggravated by work and exercise and became worse as the day progressed. (*Id.*; *see id.* at 347–63). By April 2009, Plaintiff was frustrated and agitated by increased pain, tenderness and spasms, and restricted range of motion. (*Id.* at 292). On April 3, 2009, Plaintiff's chiropractor found vertebral subluxation, decreased range of motion, palpatory tenderness and trigger point sensitivity in the cervical, thoracic and lumbar regions. (*Id.* at 343). The chiropractor diagnosed cervicobrachial syndrome, deep and superficial muscle spasms, and cervical, thoracic and lumbar segmental dysfunctions. (*Id.*) She recommended that Plaintiff not work because of her chronic shoulder and neck ailments. (*Id.* at 341).

In January 2009, Plaintiff began treating with Nick S. Kouchis, M.D. (R. at 378). She presented with complaints of bilateral neck, shoulder, shoulder blade, and upper arm weakness and soreness, right side worse than left side and exacerbated by movement. (*Id.*). Dr. Kouchis found trigger point tenderness and tightness over the

rotator cuff muscles, along with right side deltoid tenderness. (*Id.*). He diagnosed right cervical brachial syndrome and shoulder rotator cuff tendonitis and ordered physical therapy. (*Id.* at 379). On February 4, 2009, Plaintiff complained of waxing and waning left shoulder scapular pain, which worsened with exercise. (*Id.* at 364). She reported sometimes feeling better with therapy but sometimes worse, and expressed frustration with her lack of progress. (*Id.*). Dr. Kouchis's examination was unremarkable. (*Id.*) He prescribed Diazepam, reduced physical therapy to twice weekly, and considered trigger point injections. (*Id.*). On February 18, 2009, Plaintiff reported some improvement to her left shoulder, denied neck, chest or back pain, and denied headaches. (*Id.* at 357). Dr. Kouchis refilled Diazepam and considered trigger point injections if no improvement. (*Id.*).

On March 11, 2009, Plaintiff reported pain improvement and increased range of motion, but continued tenderness. (R. at 351). Dr. Kouchis found full range of motion and strength in her upper extremity. (*Id.*). He diagnosed bilateral thoracic back pain and bilateral shoulder impingement syndrome. (*Id.*). He noted that Plaintiff "is very motivated and sometimes over participates in her exercises." (*Id.*). Dr. Kouchis refilled Diazepam and continued biweekly physical therapy sessions. (*Id.*). On March 25, 2009, Plaintiff reported that her upper back pain was much improved but that she had been recently experiencing left shoulder pain. (*Id.* at 345). The pain was exacerbated when doing exercises that flexed her elbow and shoulder, even with minimal weights. (*Id.*). On examination, Dr. Kouchis found full range of motion of the shoulder and elbow, strength 5/5, no swelling, and no focal or neurologic defi-

cits. (*Id.*). He assessed Plaintiff with left biceps tendonitis secondary to overuse. (*Id.*). Dr. Kouchis urged Plaintiff to be patient with her exercises and other therapy to avoid overuse. (*Id.* at 346). He referred her for additional physical therapy. (*Id.* at 275).

On April 2, 2009, Plaintiff was examined by E. Thomas Marquardt, M.D. (R. at 338–40). She reported seeing chiropractors, pain management physicians, and physical therapists, none of which alleviated her shoulder pain. (*Id.* at 338). X-rays of her left shoulder were normal. (*Id.* at 339). Dr. Marquardt's examination of Plaintiff's left shoulder found limited motion at the extremes, impingement test was negative, with excellent strength of all shoulder girdle musculature. (*Id.* at 339). Dr. Marquardt diagnosed myofascial syndrome with apparent rotator cuff syndrome of the left shoulder. (*Id.*). He concluded that her MRI scans do not show any significant pathologic process that accounts for her pain. (*Id.*). He injected her left shoulder with a cortisone treatment for possible relief. (*Id.* at 339–40).

On April 3, 2009, a diagnostic ultrasound examination of Plaintiff's left shoulder found significant cortical irregularity, indicating possible joint instability, possible subacromial impingement with significant acromial margin spurring, and possible posterior impingement. (R. at 413). On April 21, 2009, an MRI examination of Plaintiff's left shoulder indicated possible inflammation secondary to previous radiation or lymph edema. (*Id.* at 415). On April 29, 2009, Dr. Marquardt reviewed the MRI results, concluding that Plaintiff's pain was not an orthopedic issue but was instated related to nerve root irritation. (*Id.* at 422). He opined that Plaintiff's dif-

fuse pain, which involves her shoulder, left arm and left side of her face "clearly is neurologic in origin." (*Id.*).

On April 9, 2009, Plaintiff's chiropractor summarized Plaintiff's progress. (R. at 412). While Plaintiff's pain levels had subsided and exacerbated since December 2008, overall the chiropractor observed substantial progress. (*Id.*). However, on March 25, 2009, Plaintiff complained of significant exacerbation. (*Id.*). Consequently, the chiropractor referred her to Ning Sun, M.D.

That same day, Plaintiff began treating with Dr. Sun. (R. at 432–33; *see id.* at 493). He conducted a neurological consultation, concluding that Plaintiff had progressive left shoulder and neck pain, cervical dystonia[10] and muscle spasm, left posterior shoulder muscle spasm and dystonia, left leg pain of unclear etiology, and left occipital neuralgia, likely caused by left skull base pain. (*Id.* at 433). Nerve conduction studies were within normal limits. (R. at 431). Dr. Sun found evidence of irritation in the left C4–7 cervical paraspinal muscles, suggesting either underlying nerve roots irritation or increasing muscle tone due to muscle spasm. (*Id.*). He pre-

---

[10] "Dystonia is a disorder characterized by involuntary sustained muscle contractions resulting in twisting and repetitive movements or abnormal postures." <emedicine.medscape.com> "Cervical dystonia, also called spasmodic torticollis, is a painful condition in which [the] neck muscles contract involuntarily, causing [the] head to twist or turn to one side. Cervical dystonia can also cause [the] head to uncontrollably tilt forward or backward. A rare disorder that can occur at any age, even infancy, cervical dystonia most often occurs in middle-aged people, women more than men. Symptoms generally begin gradually and then reach a point where they don't get substantially worse. There is no cure for cervical dystonia. The disorder sometimes resolves without treatment, but sustained remissions are uncommon. Injecting botulinum toxin into the affected muscles often reduces the signs and symptoms of cervical dystonia. Surgery may be appropriate in a few cases." <www.mayoclinic.org>

scribed Vicoprofen and Medrol,[11] continued Valium, and ordered a left shoulder MRI with contrast to rule out a structural lesion, such as a tumor. (*Id.* at 433).

On April 11, 2009, Plaintiff began treating with Haohua Yang, M.D. (R. at 455–56). She complained of severe insomnia, persistent upper back and chest pain, and depressed mood. (*Id.* at 455). A physical examination found multiple tenderpoints along the right mid to upper cervical spine, along with multiple intercostal space on the left side. (*Id.*). Dr. Yang recommended electro stimulation therapy. (*Id.*).

On April 17, 2009, Plaintiff returned to Dr. Sun for a neurological reevaluation. (R. at 429–30). She complained of left neck and shoulder pain, but acknowledged not taking her medications. (*Id.* at 429). On examination, Dr. Sun found left shoulder and neck tenderness and evidence of muscle irritation, suggesting muscle spasm. (*Id.*). Dr. Sun diagnosed progressive left shoulder and neck pain, cervical dystonia and muscle spasm, left posterior shoulder muscle spasm and dystonia, left leg pain of unclear etiology, left occipital neuralgia likely the etiology of her left skull base pain, and left breast mass lesion. (*Id.* at 430). He recommended an MRI of her left brachial plexus, continued medications, and added a Botox treatment for her cervical dystonia. (*Id.*).

On April 24, 2009, Plaintiff reported that her neck and shoulder pain had improved with Vicoprofen and Medrol. (R. at 427). She presented with a stressful appearance. (*Id.*). Dr. Sun found that the MRI showed possible inflammation involving

---

[11] Vicoprofen contains a combination of hydrocodone and ibuprofen and is used short-term to relieve severe pain. Medrol (methylprednisolone) is a steroid used to treat various inflammatory conditions. <www.drugs.com>

left brachial plexus and mild tendinopathy in left shoulder. (*Id.*). An examination was largely unremarkable. (*Id.*). Dr. Sun continued Vicoprofen and recommended rest and orthopedics for Plaintiff's tendinopathy. (*Id.* at 428).

On May 13, 2009, Plaintiff reported increasing pain in left neck, skull, arm, and leg, along with recurring headaches, which are temporarily relieved by Arthrotec and Vicoprofen. (R. at 435). Other than presenting with a stressful appearance and finding some tenderness in Plaintiff's left shoulder, neck and skull, Dr. Sun's physical examination was unremarkable. (*Id.*). Plaintiff declined further medical treatment, telling Dr. Sun that she would be seeking the opinion of a Chinese medicine specialist in China. (*Id.* at 436).

On August 18, 2009, Plaintiff was examined by Dr. Guang Chen at Nanjing Gulou Hospital. (R. at 437). Plaintiff reported a history of cervical pain with mobility difficulty in both upper extremities, which was exacerbated after exposure to cold. (*Id.*). Dr. Chen found that both shoulder joints have mild limitation of external extension and rotation, along with tenderness and irritation of muscle around bilateral scapula. (*Id.*). An MRI showed cervical disc herniation at C4/5. (*Id.*). Dr. Chen diagnosed cervical disc herniation and cervical muscle fasciitis and recommended comprehensive rehabilitation including physical therapy, spinal manipulation, and electrical stimulation for six months. (*Id.*).

On October 31, 2009, Plaintiff complained of insomnia and persistent upper back and chest pain, but acknowledged that her symptoms had improved after five months of rehab in China. (R. at 457). Dr. Yang's physical examination was largely

unremarkable. (*Id.*). He diagnosed backache, pernicious anemia and insomnia, prescribed Motrin PM, and recommended a B12 vitamin injection. (*Id.*).

On November 4, 2009, Plaintiff returned to Dr. Sun for a reevaluation. (R. at 447–48). She reported some improved symptoms but complained of significant left neck and shoulder pain, trouble using her left hand and arm, and mild left posterior headaches. (*Id.* at 447). Other than tenderness in Plaintiff's left shoulder, neck, and skull, Dr. Sun's physical and mental examinations were unremarkable. (*Id.* at 448). He assessed left brachial plexopathy, cervical dystonia and muscle spasm, left shoulder tendinopathy, left occipital neuralgia, and possible complex regional pain syndrome.[12] (*Id.*). Dr. Sun continued Arthrotec and prescribed a trial of Amrix.[13] (*Id.*).

On November 9, 2009, Plaintiff complained of significant headache, neck pain, blurry vision, and left shoulder pain. (R. at 449). Other than tenderness in Plaintiff's neck, shoulder, and skull, Dr. Sun's examination was unremarkable. (*Id.* at 450). He continued her medications and recommended a brain MRI. (*Id.*). On November 13, 2009, Plaintiff reported no changes to her symptoms. (*Id.* at 451). Her medications were continued. (*Id.* at 452). On December 3, 2009, Plaintiff reported

---

[12] "Complex regional pain syndrome is an uncommon form of chronic pain that usually affects an arm or a leg. . . . The cause of complex regional pain syndrome isn't clearly understood." <http://www.mayoclinic.org/diseases-conditions/complex-regional-pain-syndrome/basics/definition/con-20022844> [hereinafter Mayo Clinic: Complex Regional Pain Syndrome]

[13] Amrix (cyclobenzaprine) is a muscle relaxant used for relief of muscle spasm associated with acute, painful musculoskeletal conditions. <www.drugs.com>

no headaches but continued pain in neck, shoulder, and arm. (*Id*. at 453). Dr. Sun continued Plaintiff's medications. (*Id*. at 454).

On December 23, 2009, Plaintiff reported no change to her neck and upper back pain. (R. at 459). A physical examination was largely unremarkable. (*Id*.). Dr. Yang diagnosed unspecified idiopathic peripheral neuropathy, insomnia, hypothyroidism, pain in thoracic spine, and backache. (*Id*.).

On February 10, 2010, Herman P. Langner, M.D., conducted a psychiatric evaluation on behalf of the Commissioner. (R. at 461–63). Plaintiff was cooperative but disorganized. (*Id*. at 461). She complained of chronic neck, shoulder, and myofascial pain, headaches, numbness of left hand and leg, depression, anxiety, and erratic sleep. (*Id*. at 461–62). She reported taking Lexapro and Diazepam for her psychiatric condition. (*Id*. at 461). Dr. Langer found Plaintiff's affect to be somewhat agitated and anxious; she was oriented to date, time, place, and person; her remote and recent memory, insight, and judgment were intact; and her fund of knowledge was good. (*Id*. at 462–63). Dr. Langer diagnosed generalized anxiety disorder and dysthymic disorder and assigned a Global Assessment of Functioning (GAF) score of 40.[14] (*Id*. at 463).

---

[14] The GAF includes a scale ranging from 0–100, and indicates a "clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Rev. 2000). A GAF score of 31–40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). *Id*. at 34. The Court notes that the fifth edition of the DSM, published in 2013, has abandoned the GAF scale because of "its conceptual lack of

On March 10, 2010, Tyrone Hollerauer, Psy.D., a state agency medical consultant, completed a Psychiatric Review Technique (PRT) form. (R. at 468–81). Based on his review of the medical evidence, Dr. Hollerauer found that Plaintiff was mildly limited in maintaining social functioning and maintaining concentration, persistence or pace. (*Id.* at 478). He concluded that Plaintiff was depressed and anxious secondary to her medical condition and situation. (*Id.* at 480). He also noted that anxiety may be a side effect of her medication. (*Id.*).

On March 24, 2010, Fran Jimenez, M.D., another state agency medical consultant, completed a physical RFC assessment. (R. at 482–89). He reviewed the medical evidence, finding that Plaintiff has a history of cervical pain with mobility difficulties in both upper extremities, along with neck pain, and left shoulder tenderness. (*Id.* at 489). Dr. Jimenez concluded that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, and sit, stand, or walk about 6 hours in an 8-hour workday. (*Id.* at 483). He limited Plaintiff to occasional pushing and pulling with her left upper extremity and to occasional climbing of ladders, ropes, and scaffolds. (*Id.* at 483–84).

On July 8, 2010, Plaintiff complained of frequent neck pain, cervical muscle spasm, and shoulder pain. (R. at 491). On examination, Dr. Sun found tenderness on both sides of her neck and left shoulder, and difficulty lifting her left arm due to pain. (*Id.* at 491–92). He found evidence of irritation of muscles in her left cervical

clarity . . . and questionable psychometrics in routine practice." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013); *see Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (recognizing that the American Psychiatric Association abandoned the GAF scale after 2012).

paraspinal muscles and left shoulder muscle area, suggesting muscle spasm. (*Id.* at 492). Dr. Sun continued Plaintiff's medication and therapy. (*Id.* at 492). He opined that Plaintiff can sit and stand for only 15 minutes, cannot lift, carry, or handle objects, and should not travel. (*Id.* at 490). He advised her not to return to work. (*Id.* at 490, 492).

On April 26, 2011, Dr. Sun completed a Statement of Continued Disability for Hartford Insurance. (R. at 493–94). He diagnosed neck pain and sciatic neuralgia with continuing neck, back, and leg pain, and difficulty sitting and raising leg. (*Id.* at 493). He also diagnosed chronic depression secondary to medical conditions. (*Id.* at 494). Dr. Sun opined that Plaintiff cannot sit and can stand or walk for only 10 minutes at a time. (*Id.*). Plaintiff cannot lift or carry any weight or lift above her shoulder with her left arm. (*Id.*). She can occasionally reach at and below desk level with her left arm. (*Id.*).

Dr. Kirincic also completed a Statement of Continued Disability for Hartford Insurance on the same date. (R. at 495–96). She diagnosed diffuse fibromyalgia and spondylolisthesis with ongoing neck, upper back, shoulder, and left buttock pain extending down to the left lower extremity. (*Id.* at 495). Dr. Kirincic opined that Plaintiff could sit, stand, or walk for two hours at a time, and should not carry any weight or reach bilaterally. (*Id.* at 496).

On August 18, 2010, Plaintiff complained of increasing neck and left shoulder and arm pain in the previous two weeks. (R. at 498). Dr. Sun continued her medications but advised her to discontinue physical therapy. (*Id.*). On September 14, 2010,

Plaintiff presented to Dr. Sun in tears because of her ongoing pain symptoms. (*Id.* at 499). He diagnosed left brachial plexopathy, cervical dystonia and muscle spasm, left shoulder tendinopathy, left occipital neuralgia, and possible complex regional pain syndrome. (*Id.*). Dr. Sun continued her medications, gave her a trial sample of Amrix, ordered an EMG/NCS study,[15] and recommended a Botox treatment for her cervical dystonia. (*Id.*). On October 14, 2010, Plaintiff decided to try chiropractic treatment before having another Botox injection. (*Id.* at 500). On November 24, 2010, Plaintiff reported neck and shoulder pain more on the left side with great difficulty moving her neck and shoulder, along with insomnia. (*Id.* at 501). She stopped taking Diazepam and Flexeril because of side effects. (*Id.*). Dr. Sun continued her therapy, gave her a trial sample of Ambien CR,[16] and recommended a Botox injection. (*Id.*). On February 10, 2011, Plaintiff reported using a heating pad and doing gentle exercises to relieve her pain. (*Id.* at 502). Dr. Sun continued her medications, added a Flector Patch,[17] and recommended a Botox injection. (*Id.*).

On April 8, 2011, Plaintiff reported new symptoms of left leg shooting pain in the back of her thigh, along with depression related to her medical conditions. (R. at 503). Dr. Sun found tenderness in left shoulder, bilateral neck areas, and left occipi-

---

[15] An electromyogram (EMG) measures the electrical activity of muscles at rest and during contraction. A nerve conduction study (NCS) measures how well and how fast the nerves can send electrical signals. Nerve and muscle problems cause the muscles to react in abnormal ways. These tests check how well the spinal nerves and the nerves in the arms and legs are working. <www.webmd.com>

[16] Ambien CR (zolpidem) is a sedative used to treat insomnia. <www.drugs.com>

[17] Flector Patch (diclofenac) is a nonsteroidal anti-inflammatory drug (NSAID), which works via a skin patch by reducing hormones that cause inflammation and pain in the body. <www.drugs.com>

tal lobe. (*Id.*). Plaintiff had involuntary muscle spasm in the left neck, and a positive straight leg raising (SLR) test on the left with pain triggered at 60 degrees.[18] (*Id.*). Dr. Sun diagnosed left brachial plexopathy, cervical dystonia and muscle spasm, left shoulder tendinopathy, left occipital neuralgia, possible complex regional pain syndrome, insomnia, left S1 radiculopathy, and depression. (*Id.*). He ordered an MRI and prescribed Zoloft. (*Id.*). On the same date, the EMG/NCS study was performed. (*Id.* at 505). The study was generally unremarkable but did find evidence of left S1 radiculopathy. (*Id.*). An imaging study was recommended. (*Id.*).

On April 21, 2011, Dr. Kirincic found limited flexibility and lumbar range of motion due to pain in Plaintiff's left sacral area. (R. at 507). She diagnosed diffuse fibromyalgia, minimal curvature, minimal degenerative changes at L4/5, chronic pain and post-traumatic fibromyalgia-like symptoms, and anxiety. (*Id.*). Dr. Kirincic continued physical therapy, recommended a home exercise program and trigger point injections, and prescribed Cymbalta.[19] (*Id.*).

On April 26, 2011, Plaintiff reported being unable to sit because of her continuing left leg and buttock pain. (R. at 504). She stated that her depression improved with Zoloft. (*Id.*). Dr. Sun noted that Plaintiff's MRI indicated a mild L4/5 disc her-

[18] The SLR test is used "to determine whether a patient with low back pain has an underlying herniated disk." <http://en.wikipedia. org/wiki/Straight_leg_raise> "If the patient experiences sciatic pain when the straight leg is at an angle of between 30 and 70 degrees, then the test is positive and a herniated disc is likely to be the cause of the pain." *Id.*

[19] Cymbalta (duloxetine) is used to treat major depressive disorder and general anxiety disorder. <www.drugs.com>

niation and that Dr. Kirincic had diagnosed piriformis syndrome.[20] (*Id.*). He continued Zoloft and added Vicoprofen and Flexeril. (*Id.*). An April 28, 2011 x-ray of Plaintiff's lumbar spine indicated possible calcific tendonitis and subtle evidence of early degenerative disc disease at L4/5. (*Id.* at 506).

The ME testified that Plaintiff's medical impairments include left shoulder tendonitis, hypothyroidism, and osteoporosis. (R. at 47). He noted that while there was some evidence of brachial plexopathy, complex regional pain syndrome, cervical dystonia, muscle spasms, fibromyalgia, the ME would need additional tests and an expert diagnosis to confirm. (*Id.* at 47–49). He opined that Plaintiff is capable of working at a sedentary exertion level and is precluded from climbing ladders, ropes, and scaffolds. (*Id.* at 50).

On June 27, 2011, Michael J. Ingersoll, Ph.D., conducted a psychological examination for the Bureau of Disability Determination Services (DDS). (R. at 509–15). Dr. Ingersoll reviewed the medical records, including Dr. Langner's evaluation, and received an oral history from Plaintiff, who he found to be a reliable historian. (*Id.* at 509, 510). Plaintiff was moderately anxious but did not exhibit any signs of depression. (*Id.* at 509–10). She was well oriented in all spheres, had fair to good attentiveness given her level of anxiety, and did not display any gross, cognitive deficit. (*Id.* at 510). Dr. Ingersoll diagnosed generalized anxiety disorder. (*Id.* at 511).

---

[20] "Piriformis syndrome is a neuromuscular disorder that occurs when the sciatic nerve is compressed or otherwise irritated by the piriformis muscle causing pain, tingling and numbness in the buttocks and along the path of the sciatic nerve descending down the lower thigh and into the leg." < http://en.wikipedia.org/wiki/Piriformis_syndrome>

# V. DISCUSSION

Pro se Plaintiff Ling Hu raises a number of arguments in support of her request for a reversal and remand. Her principal arguments can be summarized as: (1) the ALJ's RFC determination did not properly account for her fibromyalgia, myofascial pain syndrome, and complex regional pain syndrome; (2) the ALJ did not give proper weight to the opinion of Dr. Kirincic; and (3) the ALJ's credibility determination was patently wrong. The Court addresses each argument in turn.

## A. The ALJ's RFC Determination Did Not Properly Account for Plaintiff's Fibromyalgia, Myofascial Pain Syndrome, and Complex Regional Pain Syndrome

The ALJ determined that Plaintiff has left shoulder tendonitis, osteoporosis, hypothyroid disease, brachial plexopathy, and cervical spine protrusions. (R. at 15). After examining the medical evidence and giving partial credibility to some of Plaintiff's subjective complaints, the ALJ found that Plaintiff has the RFC to perform sedentary work,[21] but is precluded from climbing ladders, ropes and scaffolds; is precluded from unprotected heights and hazards; and can only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (*Id.* at 16).

"The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000; see 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do de-

---

[21] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

spite your limitations."); Social Security Ruling (SSR)[22] 96-8p, at *2 ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."). The RFC is based upon medical evidence as well as other evidence, such as testimony by the claimant or his friends and family. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). In assessing a claimant's RFC, "the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe," and may not dismiss evidence contrary to the ALJ's determination. *Villano*, 556 F.3d at 563; see 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all relevant evidence in your case record."); SSR 96-8p, at *7 ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.").

After carefully examining the record, the Court is troubled by the ALJ's failure to consider the effects of Plaintiff's fibromyalgia, myofascial pain syndrome, and complex regional pain syndrome on her ability to work. *See Johnson v. Colvin*, No. 13 C1023, 2014 WL 2765701, at *1 (E.D. Wis. June 18, 2014) ("Because [fibromyal-

---

[22] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); see 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

gia and complex regional pain syndrome] often produce pain and other symptoms out of proportion to the 'objective' medical evidence, it is crucial that the disability adjudicator evaluate credibility with great care and a proper understanding of the diseases."). Complex regional pain syndrome "is a unique clinical syndrome that may develop following trauma, characterized by complaints of intense pain typically out of proportion to the severity of the injury and usually including signs of autonomic dysfunction." *Id.* at *2. To assist ALJ's in evaluating cases involving complex regional pain syndrome, the Commissioner has established guidelines for ALJs to follow. *See* SSR 03-2p. The Ruling cautions that signs of complex regional pain syndrome may be present at one examination and not appear at another. *Id.* at *4. Nor is it unusual for the medical record to contain conflicting evidence in cases of complex regional pain syndrome due to the transitory nature of its objective findings and the complicated diagnostic process involved. *Id.* at *5.

Many of these same issues arise in the evaluation of fibromyalgia, which "is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues. Researchers believe that fibromyalgia amplifies painful sensations by affecting the way [the] brain processes pain signals." Mayo Clinic: Fibromyalgia; *accord Williams v. Colvin*, 757 F.3d 610, 612 (7th Cir. 2014); *see also Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996) ("The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and—the only symptom that discriminates between it and other diseases of a rheumatic character— multiple tender spots, more precisely 18 fixed locations on the body (and the rule of

thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch."). "There are no laboratory tests for the presence or severity of fibromyalgia. Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective." *Sarchet*, 78 F.3d at 306; *see Holmstrom v. Metro Life Ins. Co.*, 615 F.3d 758, 768–69 (7th Cir. 2010) (because no objective test exists for fibromyalgia and complex regional pain syndrome, the plaintiff need not "prove her condition with objective data"); *accord Kuznowicz v. Wrigley Sales Co.*, No. 11 C 165, 2013 WL 4052381, at *14 (N.D. Ill. Aug. 12, 2013). "The pain and lack of sleep associated with fibromyalgia can interfere with [the] ability to function at home or on the job." Mayo Clinic: Fibromyalgia. Shortly after the ALJ decided this case, the Commissioner issued guidance for evaluating fibromyalgia claims that admonishes adjudicators to be aware of the fluctuating nature of symptoms, which will produce good and bad days, the need to evaluate credibility with care, and the importance of considering longitudinal records reflecting ongoing medical evaluation and treatment from medical sources. *See* SSR 12–2p.

Similarly, myofascial pain syndrome is "a chronic pain disorder" where "pressure on sensitive points in [the] muscles (trigger points) causes pain in seemingly unrelated parts of [the] body." Mayo Clinic: Myofascial Pain Syndrome; *accord Utterback v. Colvin*, No. 11 CV 126, 2014 WL 976899, at *16 (W.D. Wis. March 21, 2014). The fibromyalgia syndromes—myofascial pain syndrome, fibrositis, fibromyositis—are "a group of common nonarticular disorders characterized by achy pain, tenderness,

and stiffness of muscles, areas of tendon insertions, and adjacent soft tissue structures." *The Merck Manual* 481 (17th ed. 1999). "Some research suggests that myofascial pain syndrome may develop into fibromyalgia in some people." Mayo Clinic: Myofascial Pain Syndrome.

Here, the ALJ did not include Plaintiff's fibromyalgia, myofascial pain syndrome, and complex regional pain syndrome among her severe impairments. (*See* R. at 15) (finding that Plaintiff's severe impairments only included left shoulder tendonitis, osteoporosis, hypothyroid disease, brachial plexopathy, and cervical spine protrusion). In fact, in discussing the medical evidence, the ALJ's decision *does not once* mention Plaintiff's fibromyalgia, myofascial pain syndrome, and complex regional pain syndrome, despite the medical record being replete with such diagnoses. (*See*, *e.g.* R. at 226–28 (Dr. Kirincic finding multiple fibromyalgia trigger points in October 2008 and diagnosing fibromyalgia and myofascial pain syndrome), 230 (Dr. Kirincic finding Plaintiff positive for 18/18 fibromyalgia trigger points and diagnosing fibromyalgia and myofascial pain syndrome in December 2008), 357, 364, 378 (Dr. Kouchis finding trigger point tenderness and recommending trigger point injections in January and February 2009), 339 (Dr. Marquardt diagnosing myofascial pain syndrome in April 2009), 448 (Dr. Sun diagnosing possible complex regional pain syndrome in November 2009), 495, 507 (Dr. Kirincic diagnosing diffuse fibromyalgia and post-traumatic fibromyalgia-like symptoms in April 2011), 499 (Dr. Sun diagnosing possible complex regional pain syndrome in September 2010), 503 (Dr. Sun diagnosing possible complex regional pain syndrome in April 2011)). Moreover,

the ME testified that Plaintiff's symptoms are consistent with complex regional pain syndrome and fibromyalgia, but that Plaintiff needs more testing and an expert diagnosis to confirm. (*Id.* at 47–49).

On remand, the ALJ shall seek appropriate expert medical advice to determine what effects Plaintiff's fibromyalgia, myofascial pain syndrome, and complex regional pain syndrome have on her ability to work. The ALJ shall then reassess Plaintiff's RFC by "evaluating all limitations that arise from medically determinable impairments, even those that are not severe." *Villano*, 556 F.3d at 563. "In making a proper RFC determination, the ALJ must consider all of the relevant evidence in the record, even limitations that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Murphy v. Colvin*, — F.3d —, No. 13-3154, 2014 WL 3586260, at *5 (7th Cir. July 22, 2014), as amended (Aug. 20, 2014); *see Goins v. Colvin*, — F.3d —, No. 13-3729, 2014 WL 4073108, at *4 (7th Cir. Aug. 19, 2014) ("We keep telling the Social Security Administration's administrative law judges that they have to consider an applicant's medical problems in combination.") (collecting cases). The RFC shall be "expressed in terms of work-related functions" and include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and nonmedical evidence. SSR 96-8p.

## B. The ALJ's Credibility Determination is Patently Wrong

An ALJ's credibility determination may be overturned only if it is "patently wrong." *Craft*, 539 F.3d at 678. In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, [his] level of pain or symp-

toms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing SSR 96-7p; 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p.

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted); *see* SSR 96-7p. "Without

an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942.

Plaintiff testified that she can hardly drive because of her pain. (R. at 31). On occasion, she takes Vicoprofen and Flexeril to alleviate the pain, and Zoloft for her depression. (*Id.* at 33–34). She is unable to do household chores and takes her time with her personal care. (*Id.* at 34). She explained that she is unable to work because she cannot stay in one position very long. (*Id.*). She can sit for less than five minutes before having to stand or kneel to relieve the pain. (*Id.* at 41). During the hearing, she knelt for a while and at other times she sat on her right side. (*Id.* at 40–42).

In his decision, the ALJ found Plaintiff's statements not credible to the extent that they were inconsistent with the RFC:

> [Plaintiff's] objective testing has revealed only mild abnormalities not fully consistent with the severity of [Plaintiff's] allegations. She alleges neck, shoulder and upper back pain, but a thoracic spine MRI showed no abnormality and a cervical spine MRI showed only slight protrusions at C5-C6 and C4-C5. [Plaintiff's] 2008 cervical and thoracic spine x-rays were characterized as "unremarkable." Additionally, 2009 left shoulder x-rays were normal. Other testing resulted in diagnoses of osteoporosis and left shoulder tendonitis. Her doctor also diagnosed her with brachial plexopathy, but there is no evidence of an abnormal bone scan to support this diagnosis. Further, this diagnosis would not account for pain outside of [Plaintiff's] neck and shoulder area, such as her alleged left leg numbness. Objective testing for [Plaintiff's] lumbar spine showed only "subtle evidence of early degenerative disc disease," which is not the kind of abnormality one would expect for a person alleging totally disabling lower back pain shooting into her legs. The undersigned also notes that [Plaintiff's] orthopedist explained that objective testing did not show any significant pathological process to account for [Plaintiff's] alleged pain.
>
> Similarly, physical examinations have not revealed findings suggested of greater restrictions than those in this decision. She is noted to have tenderness but 5/5 strength and intact sensation and reflexes with only

a limited range of motion and pain at the extremes. She also is de-
scribed as walking with a normal gait and having normal posture.
Limitations in her physical examinations are generally due to [Plain-
tiff's] subjective pain rather than any objective clinical signs.

Although [Plaintiff] has received treatment for the allegedly disabling
impairments, that treatment has been essentially routine and/or con-
servative in nature. [Plaintiff] alleges that she had no benefit from
physical therapy and chiropractic treatment she tried prior to the al-
leged onset date, but her treatment notes show that she reported im-
provement in her condition. [Plaintiff] actually reported that her symp-
toms were relieved by physical therapy, and that they worsened again
only after going swimming and/or using upper extremity machines at
an athletic club. Another treatment note indicates that [Plaintiff's]
symptoms may be due to overuse, suggesting that she is overdoing her
exercise. The treatment notes from [Plaintiff's] neurologist also indi-
cate that [Plaintiff's] pain and muscle spasm is improved with medica-
tion.

Further, shortly after [Plaintiff] alleges she became totally disabled,
she decided not to pursue further treatment and instead vacation[ed]
in China for 5 months. Although there is evidence that [Plaintiff]
sought some treatment in China, her exams mention only "mild" symp-
toms and limitations. Moreover, when [Plaintiff] returned, she admit-
ted that her symptoms had improved. Although a vacation and a disa-
bility are not necessarily mutually exclusive, [Plaintiff's] decision to go
on a vacation tends to suggest that the alleged symptoms and limita-
tions may have been overstated.

There also is no evidence that [Plaintiff] has since had more significant
or intensive treatment. She continues to use prescribed pain medica-
tion, but she has not pursued recommendations for injections or more
physical therapy. Further, there is no suggestion that her condition
would merit surgery. The undersigned also notes that [Plaintiff's] hy-
pothyroidism is characterized as "inactive," which indicates that it is
no more limiting than indicated in this decision.

The undersigned also notes that both [Plaintiff] and her husband cred-
ibly described [Plaintiff's] daily activities and that these activities are
not limited to the extent one would expect given the complaints of dis-
abling symptoms and limitations.

(R. at 17–18) (citations omitted).

Under the circumstances, none of the reasons provided by the ALJ for rejecting

Plaintiff's credibility are legally sufficient or supported by substantial evidence.

First, as a preliminary matter, the ALJ failed to assess Plaintiff's credibility *before* determining her RFC. That Plaintiff's statements were "not credible to the extent that they are inconsistent with the above residual functional capacity assessment" (R. at 17) is "backward reasoning," *Dogan v. Astrue*, 751 F. Supp. 2d 1029, 1042 (N.D. Ind. 2010); *Johnson*, 2014 WL 2765701, at *3 ("Most significantly, the template gets things backwards."). "The implication is that the assessment (of the claimant's residual functional capacity—that is, ability to work) precedes and may invalidate the claimant's testimony about his or her ability to work." *Goins*, 2014 WL 4073108, at *4; *see Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 788 (7th Cir. 2003) (The ALJ's "post-hoc statement turns the credibility determination process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather than evaluating the [claimant's] credibility as an initial matter in order to come to a decision on the merits."). On the contrary, Plaintiff testimony must be factored into the ALJ's determination of her ability to work. *Goins*, 2014 WL 4073108, at *4.

Second, as discussed above, the ALJ's credibility analysis is fatally flawed by his failure to consider the effects of Plaintiff's fibromyalgia, myofascial pain syndrome, and complex regional pain syndrome on her ability to work. Thus, while MRIs and x-rays may not have substantiated Plaintiff's allegations of pain, other tests clearly corroborated the multiple treating physicians who diagnosed fibromyalgia, myofascial pain syndrome, and complex regional pain syndrome. (*See* R. at 226–28 (finding multiple fibromyalgia trigger points and diagnosing fibromyalgia and myofascial

pain syndrome), 230 (finding 18/18 fibromyalgia trigger points and diagnosing fibromyalgia and myofascial pain syndrome), 357, 364, 378 (finding trigger point tenderness and recommending trigger point injections), 339 (diagnosing myofascial pain syndrome), 448 (diagnosing possible complex regional pain syndrome), 495, 507 (diagnosing diffuse fibromyalgia and post-traumatic fibromyalgia-like symptoms), 499 (diagnosing possible complex regional pain syndrome), 503 (diagnosing possible complex regional pain syndrome); *see also id.* at 47–49) (ME testifying that Plaintiff's symptoms are consistent with complex regional pain syndrome and fibromyalgia)). Indeed, the negative MRIs and x-rays arguably *rule out other causes* of Plaintiff's chronic pain. *See Johnson*, 2014 WL 2765701, at *7 ("[T]he ALJ must ensure that the 'objective' evidence he considers is pertinent to the claimant's impairments."); *cf. Moon*, 2014 WL 3956762, at *3 (criticizing ALJ's reliance on "unremarkable" MRI as evidence that claimant's migraines were not debilitating; "Doctors use MRIs *to rule out other possible causes of headache*—such as a tumor—meaning that an unremarkable MRI is completely consistent with a migraine diagnosis"). Because no objective test exists for fibromyalgia and complex regional pain syndrome, Plaintiff need not "prove her condition with objective data." *Holmstrom*, 615 F.3d at 768–69.

Third, the ALJ's characterization of Plaintiff's treatment as "routine and conservative" misapprehends the medical options available for treating Plaintiff's fibromyalgia, myofascial pain syndrome, and complex regional pain syndrome. Because there is no cure for fibromyalgia, the treatment options are constrained to

nonnarcotic pain relievers, exercise, and stress-reduction measures. *See* Mayo Clinic: Fibromyalgia. Similarly, myofascial pain syndrome and complex regional pain syndrome are treated with pain relievers, physical therapy, and trigger point procedures, including acupuncture. *See* Mayo Clinic: Myofascial Pain Syndrome; Mayo Clinic: Complex Regional Pain Syndrome.

Fourth, Plaintiff's "5/5 strength and intact sensation and reflexes with only a limited range of motion and pain at the extremes" (R. at 18) is not inconsistent with a diagnosis of fibromyalgia, myofascial pain syndrome, or complex regional pain syndrome. There is no evidence indicating that these maladies cause limitations in strength or range of motion. On the contrary, the fibromyalgia syndromes—myofascial pain syndrome, fibrositis, fibromyositis—are "a group of common nonarticular disorders characterized by achy pain, tenderness, and stiffness of muscles, areas of tendon insertions, and adjacent soft tissue structures." *The Merck Manual* 481 (17th ed. 1999).

Fifth, the ALJ's dismissal of Plaintiff's visit to China as a "vacation" is not supported by substantial evidence. After consulting with a number of physicians and trying a variety of therapies to alleviate her pain, Plaintiff decided to seek the opinion of a Chinese medicine specialist in China. (R. at 436). She testified that while she was in China, she had acupuncture and massage therapy. (*Id.* at 43–44). The Mayo Clinic acknowledges that acupuncture and massage therapy "do appear to safely relieve stress and reduce pain, and . . . are gaining acceptance in mainstream medicine." Mayo Clinic: Fibromyalgia. Upon her return, she reported some tempo-

rary improvements of her symptoms. (*Id.* at 457). She continued the massage therapy but could not tolerate the acupuncture therapy because she was unable to stay in one position. (*Id.* at 46). Thus, there is simply no evidence to support the ALJ's contention that Plaintiff "decided not to pursue further treatment and instead vacation in China for 5 months."

In any event, the ALJ does not explain how Plaintiff's ability to take a vacation somehow proves that her "alleged symptoms and limitations may have been overstated." (R. at 18). For example, if the ALJ found evidence that Plaintiff was engaging in activities during her China trip that contradicts her allegation of pain, legitimate questions would be raised as to the veracity of Plaintiff's claims. But the record "does not indicate how going on vacation was inconsistent with [Plaintiff's] claimed degree of physical limitation." *Murphy*, 2014 WL 3586260, at *4.

Finally, the ALJ does not explain how the daily activities described by Plaintiff and her husband undermine Plaintiff's credibility. While it is permissible for an ALJ to consider a claimant's daily activities when assessing credibility, the Seventh Circuit has repeatedly admonished ALJs not to place "undue weight" on those activities. *Moss*, 555 F.3d at 562; *see Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011) ("[The claimant's] ability to struggle through the activities of daily living does not mean that [the claimant] can manage the requirements of a modern workplace"); *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) ("The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other

place of paid work."). Further, when an ALJ does analyze a claimant's daily activities, the analysis "must be done with care." *See Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). Here, the function reports describe symptoms and limitations similar to Plaintiff's hearing testimony. For example, in their function reports, Plaintiff and her husband reported Plaintiff's difficulty in performing daily activities. (*See* R. at 169 (needs husband's help to dress), 170 (prepares only simple meals of rice and milk), 171 (not able to enjoy writing, reading, using computer, or watching television), 172 (needs 30 minute rest after walking less than half mile), 177 (difficulty sleeping), 177 (needs earbuds or headphone to use telephone), 178 (able to spend only one half hour doing light laundry, washing dishes, and ironing), 181 (able to sit in one position for only 15 minutes)). These statements are consistent with her hearing testimony. (*See id.* at 34 (reporting difficulty with household chores and personal care), 40–42 (unable to sit in one position very long before having to stand or kneeled to relieve the pain)). The ALJ did not adequately explain how Plaintiff's ability to perform limited household activities evinces an ability to perform full-time work. *See Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) ("[An ALJ] must explain perceived inconsistencies between a claimant's activities and the medical evidence."). While the nature of personal activities is such that one can often readily attain accommodations, the modern workplace is far less forgiving. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility

in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as she would be by an employer.").

The Court finds the ALJ's credibility determination "patently wrong." *Craft*, 539 at 678. On remand, the ALJ shall reevaluate Plaintiff's complaints with due regard for the full range of medical evidence. *See Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).

## C. The ALJ Did Not Properly Evaluate Dr. Kirincic's Opinion

Plaintiff contends that the ALJ improperly rejected her treating physician's opinion. (Mot. 1). By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *accord Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). A treating physician typically has a better opportunity to judge a claimant's limitations than a nontreating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D. Ill. 1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion," and "can reject an examining physician's opinion only for reasons

supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2); other citation omitted).

Plaintiff began treating with Dr. Kirincic in September 2008. (R. at 224–25; *see id.* at 496). During regular visits over the next three years, Dr. Kirincic found multiple trigger points and diagnosed fibromyalgia and myofascial pain syndrome. (*Id.* at 226–30, 495, 507). In April 2011, Dr. Kirincic opined that Plaintiff could sit, stand, or walk for only two hours at a time, and should not carry any weight or reach bilaterally. (*Id.* at 496).

The ALJ rejected Dr. Kirincic's opinion, concluding that it

> is neither consistent with [Plaintiff's] own reports or with the treatment record, which revealed only minimal abnormalities. Dr. Kirincic also opined that [Plaintiff] could never lift any amount of weight and could never reach above shoulder or at waist level, but she provided no clinical findings to support such severe restrictions. Moreover, [Plaintiff] has performed much greater activities during physical therapy, and reported improvement in her symptoms with those activities. The undersigned also notes that she indicated [Plaintiff] remained capable of frequent fingering and handling, which would suggest that [Plaintiff] would be able to perform her past computer work. Again, the undersigned emphasizes that Dr. Kirincic's course of prescribed treatment is not consistent with her opinion that [Plaintiff] is unable to work. She treated [Plaintiff] with only physical therapy and non-narcotic prescription medication, which is not the course of treatment one would expect if [Plaintiff] was experiencing totally disabling pain.

(R. at 20) (citation omitted).

Under the circumstances, the ALJ's decision to give Dr. Kirincic's opinion no weight is legally insufficient and not supported by substantial evidence. First, as discussed above, the ALJ ignores the medical evidence indicating that Plaintiff has

fibromyalgia, myofascial pain syndrome, and complex regional pain syndrome and the impact that these ailments have on Plaintiff's health. Contrary to the ALJ's conclusion, these maladies are not "minimal abnormalities." (R. at 20). On the contrary, "[f]ibromyalgia is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues." *See* Mayo Clinic: Fibromyalgia. Similarly, "[m]yofascial pain syndrome is a chronic pain disorder, in which pressure on sensitive points in the muscles (trigger points) causes pain in seemingly unrelated parts of the body." *See* Mayo Clinic: Myofascial Pain Syndrome.

Second, the ALJ criticizes Dr. Kirincic's course of treatment—nonnarcotic prescription medication and physical therapy (R. at 20)—but this is exactly the type of treatment recommended for fibromyalgia, myofascial pain syndrome, and complex regional pain syndrome. For example, narcotic pain medications "are not advised, because they can lead to dependence and may even worsen the pain over time." Mayo Clinic: Fibromyalgia. And physical therapy may relieve the pain associated with fibromyalgia, myofascial pain syndrome, and complex regional pain syndrome. *See*, *e.g.*, Mayo Clinic: Myofascial Pain Syndrome; *Johnson*, 2014 WL 2765701, at *6 ("[T]he ALJ failed to appreciate that exercise is customarily suggested treatment for fibromyalgia.").

Finally, there is sufficient medical evidence to support Dr. Kirincic's conclusion that by April 2011, Plaintiff could not lift any amount of weight and could not reach above shoulder or at waist level. (R. at 496). In early 2009, Plaintiff was diagnosed with cervicobrachial syndrome, deep and superficial muscle spasms, and cervical,

thoracic and lumbar segmental dysfunctions. (*Id.* at 343, 351, 378). A diagnostic ultrasound examination of Plaintiff's left shoulder found significant cortical irregularity, indicating possible joint instability, possible subacromial impingement with significant acromial margin spurring, and possible posterior impingement. (*Id.* at 413). Dr. Sun concluded that Plaintiff had progressive left shoulder and neck pain, cervical dystonia and muscle spasm, left posterior shoulder muscle spasm and dystonia, left leg pain of unclear etiology, and left occipital neuralgia, likely caused by left skull base pain. (*Id.* at 433). In July 2010, Plaintiff had tenderness on both sides of her neck and left shoulder and difficulty raising her left arm due to pain. (*Id.* at 491–92). Dr. Sun found evidence of irritation of muscles in left cervical paraspinal muscles and left shoulder muscle area, suggesting muscle spasm. (*Id.* at 492). He opined that Plaintiff can sit and stand for only 15 minutes, cannot lift, carry, or handle objects, and should not travel. (*Id.* at 490).

On remand, the ALJ shall reevaluate the weight to be afforded Dr. Kirincic's opinion. If the ALJ has any questions about whether to give controlling weight to Dr. Kirincic's opinion, he is encouraged to recontact her, order a consultative examination, or seek the assistance of a medical expert. *See* SSR 96-5p, at *2; 20 C.F.R. §§ 404.1517, 416.917, 404.1527(e)(2)(iii), 416.927(e)(2)(iii); *see also Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) ("If the ALJ thought he needed to know the basis of medical opinions in order to evaluate them, he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them.") (citation omitted). If the ALJ finds "good reasons" for not giving

Dr. Kirincic's opinion controlling weight, *see Campbell*, 627 F.3d at 306, the ALJ shall explicitly "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion," *Moss*, 555 F.3d at 561, in determining what weight to give Dr. Kirincic's opinion.

## D. Summary

In sum, the ALJ has failed to "build an accurate and logical bridge from the evidence to [his] conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). This prevents the court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence. On remand, the ALJ shall reassess Plaintiff's credibility with due regard for the full range of medical evidence. The ALJ shall then reevaluate Plaintiff's physical and mental impairments and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of his findings in accordance with applicable regulations and rulings. Finally, with the assistance of a VE, the ALJ shall determine whether there are jobs that exist in significant numbers that Plaintiff can perform.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [27] is **GRANTED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

Dated: September 15, 2014